*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBERT LAVELL WILSON,

Defendant-Appellant.

UNPUBLISHED
January 27, 2022

No. 351185
Muskegon Circuit Court
LC No. 97-141051-FC

Before: RONAYNE KRAUSE, P.J., and CAMERON and RICK, JJ.

PER CURIAM.

Defendant, Robert Lavell Wilson, appeals by leave granted[1] the trial court's order denying his motion for reconsideration of the trial court's denial of his full request for expert funds. We vacate and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This case arises out of defendant's 1998 convictions of first-degree murder, MCL 750.316, and carrying a firearm during the commission of a felony (felony-firearm) MCL 750.227b, following a jury trial for an offense that defendant committed when he was 17 years old. The trial court sentenced defendant to life without the possibility of parole for the first-degree murder conviction. As a result of *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016),[2] the Muskegon County prosecutor provided the trial court with notice of the defendants of whom it was aware who were sentenced to serve sentences of life in prison without the possibility of parole for offenses committed as juveniles, which included defendant. Subsequently, the

---

[1] *People v Wilson*, 506 Mich 938 (2020).

[2] The United States Supreme Court held that its decision in *Miller v Alabama*, 567 US 460, 470; 132 S Ct 2455; 185 L Ed 2d 407 (2012), prohibiting mandatory life-without-parole sentences for juvenile offenders, applied retroactively. *Montgomery*, 577 US at 209.

prosecution requested that defendant be resentenced again to life imprisonment without the possibility of parole.

In response, defendant asserted that he had been incarcerated for over 18 years as a result of the offense that he committed when he was 17 years old. Defendant argued that a term of lifetime imprisonment without the possibility of parole would be "unconstitutionally disproportionate" because his "offense did not evidence irreparable corruption." Defendant requested funding from the trial court to hire two experts: a mitigation specialist and an expert in neuropsychology in anticipation of an evidentiary hearing for resentencing. Defendant requested $13,000 in order to hire a mitigation specialist and $10,000 in order to hire a neuropsychologist. Defendant argued that the trial court would be required to consider complicated questions regarding defendant's childhood, criminal history, facts of the offense, psychological and medical history, and history of the time during which he was incarcerated, the possibility of rehabilitation, and other *Miller*[3] factors, as required under MCL 769.25(6).

The trial court determined that defendant had only shown "some possibility" that an expert would be helpful and that fundamental fairness required the requested funding. The trial court reviewed defendant's presentence investigation report (PSIR) and recognized that defendant had a learning disability and emotional impairments. However, it determined that defendant's case was not distinguishable from other cases. The court also found that there was some "overlap" between the work to be performed by the requested mitigation specialists and psychologist. The trial court further noted that defendant's funding request was more than double what the court had allowed in similar cases. The court granted defendant only $6,000 of the $23,000 total requested funds to hire mitigation experts.

Defendant moved the trial court to reconsider its order and renewed his request for full funding to obtain experts. Defendant relied on this Court's recent opinion *People v Williams*, 328 Mich App 408; 938 NW2d 42 (2019), arguing that the trial court failed to explain why its order did not provide for the appropriate funding in this case. Defendant asserted that a mitigation specialist was necessary in order to interview witnesses and collect records, but the specialist could not make medical or psychological diagnoses like a neuropsychologist could. Defendant reiterated that the trial court was required to evaluate all the *Miller* factors, which required that an expert neuropsychologist testify regarding defendant's intellectual abilities. Defendant argued that an expert was necessary in order to support his argument that he was "heavily influenced by his peers who took advantage of his poor reasoning and gullibility" and that he would not have otherwise committed the offense. In conclusion, defendant asserted that the denial of his full request for expert funding would result in a fundamentally unfair hearing.

The trial court denied defendant's motion for reconsideration, concluding that it had made no palpable error in its earlier order. However, the court nonetheless increased the funding to $10,500. The trial court explained that defendant's motion showed "little link between the sums spent and the outcome" and that the trial court's order was "in line" with what other courts had approved.

---

[3] *Miller*, 576 US at 460.

## II. ANALYSIS

On appeal, defendant argues that the trial court erred by denying his full request for expert witness funding. We agree.

"We review de novo, as an issue of constitutional law implicating a defendant's due-process rights, the trial court's grant or denial of a defendant's request for state funds to retain an expert." *People v Propp*, 330 Mich App 151, 159; 946 NW2d 786 (2019).

The United States Supreme Court has explained the need for consideration of mitigation factors as it relates to juvenile offenders as follows:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. [*Miller v Alabama*, 567 US 460, 477-478; 132 S Ct 2455; 185 L Ed 2d 407 (2012) (cleaned up).]

Further, the Supreme Court explained that because of "children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," and it required trial courts to consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at 479, 480.

Trial courts must analyze an indigent defendant's request for funding to hire experts under a due-process framework that considers:

> (1) the private interest that will be affected by the action of the State, (2) the governmental interest that will be affected if the safeguard is to be provided, and (3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. [*People v Kennedy*, 502 Mich 206, 215; 917 NW2d 355 (2018) (cleaned up).]

"With respect to the first two factors, in criminal cases, both defendants and the government share an interest in fair and accurate adjudication." *Propp*, 330 Mich App at 162 (cleaned up). Therefore, the third factor will be the determinative factor in most situations in which an indigent defendant is requesting government funding in order to hire experts. See *id*.

In *Kennedy*, 502 Mich at 226, the Michigan Supreme Court explained:

Until an expert is consulted, a defendant might often be unaware of how, *precisely*, the expert would aid the defense. If, in such cases, the defendant were required to prove in detail with a high degree of certainty that an expert would benefit the defense, the defendant would essentially be tasked with the impossible: to get an expert, the defendant would need to already know what the expert would say. At the same time, the defendant's bare assertion that an expert would be beneficial cannot, without more, entitle him or her to an expert; otherwise, every defendant would receive funds for experts upon request. [Cleaned up.]

Our Supreme Court adopted the "reasonable probability standard" set forth in *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987), and held that a defendant must establish " 'that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.' " *Id*. at 228, quoting *Moore*, 809 F2d at 712.

A defendant must provide a "specific description" of the expert and "inform the court why the particular expert is necessary." *Kennedy*, 502 Mich at 227 (cleaned up). Because "defense counsel may be unfamiliar with the specific scientific theories implicated in a case," defense counsel may be unable to provide a detailed analysis. *Id*. (cleaned up). However, defense counsel is "obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case." *Id*. (cleaned up). This Court has held that the reasoning in *Kennedy* applies to situations in which a defendant is seeking funding for expert witnesses in order to prepare for a *Miller* hearing. See *Williams*, 328 Mich App at 416-417.

In his motion for expert funding, defendant included an affidavit from Juliet Yackel, an attorney and mitigation specialist. Yackel explained that a minimum of 400 hours was required in order to conduct a mitigation investigation in a case involving life without the possibility of parole. Yackel explained a number of services that mitigation specialists provide, including investigating the defendant's mental health; interviewing the defendant and other witnesses; obtaining educational, medical, employment, correctional, psychological, and social service records; working with experts to prepare chronologies and genograms; investigating the defendant's history while incarcerated to determine rehabilitation prospects; planning for the defendant's release; and preparing for the resentencing hearing. Yackel explained that record collection was time consuming and took diligence to ensure compliance and that interviews and record collection was cyclical in leading to new and old sources as the investigator learned more information.

In defendant's motion for reconsideration, he included an affidavit by Tina N. Olson, an attorney who managed mitigation specialists and attorneys. Olson, who worked in the State Appellate Defender's Office (SADO), explained that her office was working at or above capacity. Therefore, SADO could not provide mitigation services to defendant. Olson explained that there were a limited number of mitigation specialists in Michigan and none were available because of the complexity and number of defendants being resentenced as a result of *Miller*. Olson explained that SADO was representing a number of defendants whose attorneys had not sought or received

funding for qualified mitigation specialists and had life without parole sentences imposed. Olson opined that mitigation specialists were mandatory for preparing for a juvenile lifer resentencing.

Defendant additionally included an affidavit by Carol E. Holden, a psychologist who had evaluated 32 juvenile lifers. Holden explained that these evaluations were necessary because psychological states were not "static," and defendants who were sentenced as juveniles might be very different by the time of resentencing. Holden asserted that courts were "deprived of significant information" when there was not a current evaluation to consider, and courts could "not be expected to be able to assess the relevant developmental attributes of the particular individual."

We conclude that the trial court erred by denying defendant's full request for funding. See *Williams*, 328 Mich App at 417. First, defendant established that there was a reasonable probability that his named experts would have assisted him in his *Miller* hearing. See *Kennedy*, 502 Mich at 228. The first *Miller* factor considers defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 US at 477. Both defendant and the trial court refer to defendant's history of mental health and behavioral issues at school and involvement with the juvenile justice system. A mitigation specialist would be able to locate and present records related specifically to defendant's immaturity and recklessness as a 17-year-old minor. See *id*. Additionally, defendant told an investigating detective that he planned to rob the victim because he "was broke, thinkin' the wrong way, [and] took the easy way out," indicating defendant's impulsivity and immaturity.

Further, as defendant argues, the question of defendant's potential intellectual disability at the time of the offense is an important matter when the trial court analyzes the "hallmark features" of his age. The United States Supreme Court explained in *Atkins v Virginia*, 536 US 304, 316; 122 S Ct 2242; 153 L Ed 2d 335 (2002), that defendants with intellectual disabilities are considered less culpable than others. Therefore, defendant's IQ score was a significant issue for the trial court to consider when resentencing defendant, and expert testimony would assist the defense by providing the trial court with scientific insight on defendant. See *Kennedy*, 502 Mich at 228.

The second *Miller* factor considers defendant's family and home environment. See *Miller*, 567 US at 477. Defendant had minimal or no contact with his father, and both of his parents had been incarcerated for periods of defendant's childhood, resulting in defendant being under the guardianship of his grandmother. Defendant also lived in a "residential program for delinquent youth" for a period. Defendant properly argues that the mitigation specialist would need to spend time "establishing trust and interviewing" defendant and his family on personal topics and that the investigation could lead to additional interviews and record collection. Based on the record, defendant met the burden of specifically describing his proposed experts and the reasons that the experts would be helpful. See *Kennedy*, 502 Mich at 227.

The third *Miller* factor considers the circumstances of the offense, including potential pressures on the defendant. See *Miller*, 567 US at 477. The trial court agreed that "perhaps some testimony about [defendant's] susceptibility to peer pressure might be necessary," but it failed to explain why defendant's request to hire experts to partially address this exact issue was not proper. Further, the trial court stated that defendant committed the crime alone. However, testimony at trial indicated that another individual, "McGruder," spoke to defendant and twice and went inside the house where the victim was murdered immediately before the offense. Defendant told the

investigating detective that McGruder put him up to robbing the victim. Additionally, a witness provided a statement to the police indicating that he heard McGruder tell defendant about the victim having money and about robbing the victim. Although the trial court suggested that defendant utilize treatises and court cases to present on "the psychology" in this situation, no treaty or case would specifically apply defendant's environmental and intellectual circumstances to this situation. Therefore, reliance on those materials alone would not allow for a proper consideration of the *Miller* factors.

The fourth *Miller* factor considers whether a defendant could have been charged with a "lesser offense if not for incompetencies associated with youth." *Id.* at 477-478. Defendant did not address how his proposed experts would address this factor. However, defendant's intellectual abilities, susceptibility to peer pressure, and his home environment would likely affect how he interacted with officers and attorneys following his arrest, including when he made a full, recorded confession to the investigating detective the day after the offense. See *Graham v Florida*, 560 US 48, 78; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

Finally, the fifth *Miller* factor considers the defendant's rehabilitation possibilities. *Miller*, 567 US at 478. Holden's affidavit supported the conclusion that the trial court could not properly address the *Miller* factors without a current evaluation because a person's psychology is not "static." The trial court further stated that, because it presided over defendant's original trial, it remembered defendant's case. However, the trial court's memory of defendant and his case would be based on who defendant was at 17 years old, rather than on a proper consideration of defendant's current character and his possibility of rehabilitation. See *id.* The record indicates that defendant appeared remorseful the day after committing the offense, and properly funding defendant's proposed experts to present on his psychological state and behavior during his incarceration, and the possibility for rehabilitation would assist defendant in his resentencing. See *Kennedy*, 502 Mich at 228.

Regarding the second consideration under *Kennedy*, defendant established that it is reasonably probable that the trial court's decision to deny the requested funding would result in a fundamentally unfair hearing. See *id.* Olson's affidavit addressed the trial court's assertion that defense counsel had in-house mitigation specialists who could complete an investigation for defendant by showing that, in fact, the office's mitigation specialists were working at or above capacity. Olson also stated that her office was representing defendants who had not had proper mitigation investigations and were sentenced to life without the possibility of parole. Further, in its original order, the trial court introduced the proposition that the significant preparation and expert participation required for *Miller* hearings could take approximately 800 hours per case. Therefore, it appears to be undisputed that a proper mitigation investigation is necessary for a proper resentencing. Even so, the trial court provided no explanation for how it arrived at its award of first $6,000 and then $10,500 in funding, which did not fully fund defendant's proposed experts. See *Williams*, 328 Mich App at 417.

Defendant provided a specific request for a mitigation specialist and an expert neuropsychologist to assist in preparing for defendant's *Miller* hearing. See *Kennedy*, 502 Mich at 227. A defendant's constitutional right to a competent expert is not necessarily the right to choose any expert witness. See *Ake v Oklahoma*, 470 US 68, 82-83; 105 S Ct 1087; 84 L Ed 2d 53 (1985). Defendant attempted to hire local mitigation specialists. However, as Olson explained,

none of the limited and qualified mitigation specialists in Michigan were available because of the complexity and number of resentencing hearings occurring for juvenile life sentence cases. Additionally, defendant asserted that his proposed mitigation specialist charged a lower rate than many other mitigation specialists and might be able to complete the investigation for less than the estimated expense. Additionally, the proposed neuropsychologist would be able to provide the necessary evaluation as an expert in three areas, potentially conserving the trial court's resources. Further, defendant argued that it would increase costs if the mental health expert had to seek necessary records without the help of a mitigation specialist and the mitigation specialist could not diagnose defendant and apply the diagnosis to the *Miller* factors. Therefore, defendant seemingly attempted to hire competent experts in a limited field of options rather than overlooking cheaper, but still competent, options. Notably, there appears to be no dispute regarding whether defendant's proposed experts were qualified for their proposed purposes.

Moreover, as defendant argues, the trial court's concern in its original order about the overall cost of awarding experts for defendants' *Miller* hearing was an improper consideration under *Kennedy*. See *id*. at 78. There are a finite total of defendants currently awaiting resentence as a result of *Miller*, but each case requires a careful, individual assessment. Consideration of budget constraints are not proper in this analysis. See *Williams*, 328 Mich App at 416-417.

Defendant potentially had intellectual disabilities in addition to the normal considerations of a juvenile offender and certainly had environmental considerations, all of which will be important for the trial court to consider. See *Miller*, 567 US at 489. The trial court cannot properly do so without having the information in front of it and it is beyond dispute that mitigation investigations take time and efforts that defendant cannot himself provide. See *Kennedy*, 502 Mich at 226. Therefore, the trial court erred by failing to properly apply the *Kennedy* factors and denying defendant's request for expert funding. See *Williams*, 328 Mich App at 417.

We vacate the trial court's order and remand the case for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Thomas C. Cameron
/s/ Michelle M. Rick